# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL ACTION NO. 5:24-CV-00141-KDB-DCK

| | |
|---|---|
| CHRISTOPHER MOORE,<br><br>Plaintiff,<br><br>v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA AND KEURIG DR. PEPPER, INC.,<br><br>Defendants. | **ORDER** |

**THIS MATTER** is before the Court on Defendants Unum Life Insurance Company ("Unum") and Keurig Dr. Pepper's ("KDP") Motions to Dismiss and to Strike Jury Demand (the "Motions") (Doc. Nos. 18, 19); the Memorandum and Recommendations ("M&R") of the Honorable United States Magistrate Judge David Keesler to in part grant and in part deny the Motions (Doc. No. 33); and Defendants' Objections to the M&R (Doc. Nos. 34, 35). The Court has carefully considered the M&R, these Motions, and the parties' briefs and exhibits. The Court concludes after its de novo review that it will **GRANT** in part and **DENY** in part the Motions, partially adopt the M&R as set forth below, and **REMAND** the matter to the North Carolina Superior Court for Lincoln County.

## I.  LEGAL STANDARD

A district court may designate a magistrate judge to "submit to a judge of the court proposed findings of fact and recommendations for the disposition" of dispositive pretrial matters, including motions to dismiss. 28 U.S.C. § 636(b)(1). Any party may object to the magistrate judge's proposed findings and recommendations, and the court "shall make a de novo

1

determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation" and need not give any explanation for adopting the M&R. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005); *Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983). After reviewing the record, the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

*Motion to Dismiss*

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is to expose deficient allegations "at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). A claim will not survive a motion to dismiss if it contains nothing more than "labels and conclusions, and a formulaic recitation of a cause of action's elements." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265,

286 (1986)). That said, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (internal citation and quotation marks omitted).

When deciding a motion to dismiss, "a court considers the pleadings and any materials 'attached or incorporated into the complaint.'" *Fitzgerald Fruit Farms LLC v. Aseptia, Inc.*, 527 F. Supp. 3d 790, 796 (E.D.N.C. 2019) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). The Court also considers documents attached to a motion to dismiss when they are "integral and explicitly relied on in the Complaint," and where "plaintiffs do not challenge [the document's] authenticity."[1] *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-7 (4th Cir. 2015). The Court, for the purposes of a Rule 12(b)(6) motion, takes all factual allegations as true. *See Ashcroft*, 556 U.S. at 678. However, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted).

---

[1] Plaintiff challenges the authenticity of two documents in his Consolidated Response to Defendants' Motions to Dismiss. Doc. No. 24. First, he argues that a declaration (Doc. No. 19-2) by KDP employee Veronica Cossette should not be considered because he did not have the opportunity to "investigate or cross examine Ms. Cossette." Doc. No. 24 at 4. However, the objection appears to go toward the evidentiary weight of the document rather than its validity. Without addressing Plaintiff's objection, the Court does not find the document to be integral at the 12(b)(6) stage and will not consider it. Plaintiff also objects to the "Wrap Plan" document because he has not had an "opportunity to review and inspect the existence of a Wrap Plan document …." *Id.* Nevertheless, Plaintiff references the "Wrap Plan" document several times when supporting his opposition to the Motions. Thus, because the Court both finds the document integral to the question of whether the plan is subject to ERISA, and because Plaintiff cannot object to its authenticity in good faith when he has himself cited the document, the Court will consider the document. Finally, Plaintiff references the remaining documents attached to the Motions and asserts that they are not properly before the Court but does not otherwise specifically challenge their authenticity. Thus, the Court will consider only those documents it deems integral to the Complaint, including the letters (from Unum regarding Plaintiff's Short Term Disability denials) dated June 1, 2022, August 9, 2022, and February 1, 2024 (Doc. Nos. 19-6, 7, 8) as they relate to Plaintiff's Unfair and Deceptive Trade Practices Act claim against Unum.

## II. FACTS AND PROCEDURAL HISTORY

No party has objected to the Magistrate Judge's statement of the factual and procedural background of this case. Therefore, the Court adopts the facts as set forth in the M&R and will only briefly summarize them here. *See Thomas v. Arn*, 474 U.S. 140, 149–50 (1985) (explaining the Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge to which no objections have been raised). Plaintiff Christopher Moore, a former employee of Dr. Pepper/Seven Up ("DPSU"), became disabled and unable to work and sought short-term disability ("STD") payments through his employer. Doc. Nos. 1-6 at ¶¶ 5, 18; 19-5 at 2. The STD benefit was administered by KDP, who delegated that authority to Unum. Doc. No. 1-6 at ¶¶ 12-13. After Plaintiff received disability benefits for approximately sixteen weeks, Unum denied further benefits to which Plaintiff believes he was entitled.[2] *Id.* at ¶¶ 19-22.

Ultimately, Plaintiff filed this action, alleging breach of contract and violation of the North Carolina Wage and Hour Act against KDP, and violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") (as well as implied breach of contract according to Unum) against Unum. *Id.* at ¶¶ 24-55. Defendants assert that the STD plan from which Plaintiff sought benefits is a "welfare plan" subject to the Employment Retirement Income Security Act of 1974 ("ERISA") and as a result Plaintiff's state-law claims are preempted. Accordingly, Defendants filed motions to dismiss and to strike Plaintiff's jury demand. Doc. Nos. 19 at 1, 20 at 9. The Magistrate Judge found that Plaintiff had plausibly alleged the breach of contract, wage violation, and UDTPA claims, and recommended denying the Motions. The Magistrate Judge also

---

[2] The maximum benefit payment period allowed under the STD plan is twenty-six weeks, thus ten weeks of STD pay is in dispute. Doc. No. 1-6 at ¶ 15.

recommended granting Defendant Unum's Motion to Dismiss as related to any implied breach of contract claims against it. Defendants timely filed their respective objections to the M&R and the matter is ripe for this Court's review.

### III. DISCUSSION

Defendants assert that the STD plan at issue in Plaintiff's Complaint is but one plan in a group of plans called the "Wrap Plan." Doc. No. 20 at 3. The Wrap Plan, administered and funded by KDP, is a flexible benefit plan that includes programs such as health and dental insurance, employee assistance, critical illness and accident assistance, STD, and long-term disability benefits. *Id.* Five employers, presumably subsidiaries or business units of KDP, including DPSU, participate in the plan.[3] Doc. No. 1-2 at 5. KDP has a dedicated account from which it funds the STD plan and other plans. Doc. No. 19-1 at 3. While the account is kept separate from KDP's general assets, it is at least partially funded by them. Doc. Nos. 1-2 at 4, 5, 22; 24 at 6. In addition, "100% of the cost of the [STD] Plan is funded from [KDP's] general assets. Doc. Nos. 1-2 at 5, 24 at 6-8.

While KPD is designated as the employer, plan sponsor, plan administrator and claims administrator of the Wrap Plan, Unum is the designated service provider, authorized by KDP to provide "certain administrative claims handling services for the [STD] Plan." Doc. No. 20 at 5. When an employee who meets the plan's basic eligibility criteria (such as being a full-time non-union hourly employee and working at least 30 hours per week) files a claim for STD benefits, Unum reviews the claim, determines whether the party is "disabled" under the plan's criteria, and pays out any approved disability claims. *Id.* at 5. Unum pays the employee directly but has access

---

[3] The participating employers include Keurig Green Mountain, The American Bottling Co., Dr. Pepper/Seven Up Manufacturing Co., Dr. Pepper/Seven Up Inc., and Motts, LLP. Doc. No. 1-2 at 5.

to the STD account at KDP and reimburses itself from the account for any payments it makes. Doc. No. 19-1 at 3. Unum also performs reevaluations as to eligibility and will stop payments when it considers an employee no longer disabled. Doc. No. 20 at 6.

A. *The STD Plan and ERISA*

As discussed above, the key to the Motions (and particularly, the Motions to Strike) is determining whether the STD plan falls under ERISA. Defendants argue that the plan is subject to ERISA; in turn, Plaintiff asserts that the STD plan is a "payroll practice" exempt from ERISA. Congress passed ERISA in 1974 to protect employees from mismanagement of funds created by employers to support employee benefit programs. *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989). ERISA defines an "employee welfare benefit plan" or "welfare plan" to include any plan, fund, or program "established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . benefits in the event of sickness, accident, disability, death or unemployment," among other things. 29 U.S.C. § 1002(1).

A plan exists for ERISA purposes when the benefits provided require "an ongoing administrative program" or scheme. *Donovan v. Branch Banking & Tr. Co.*, 220 F. Supp. 2d 560, 564 (S.D.W. Va. 2002) (quoting *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11 (1987)). "The requirement of an ongoing scheme is minimal." *Sherwood v. Valley Health Sys.*, No. 5:23-CV-00005, 2023 WL 2859126, at *4 (W.D. Va. Apr. 10, 2023) (quoting *D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130 n.2 (1992) (internal quotations omitted). While the Fourth Circuit has not provided a specific framework for determining whether a plan requires an ongoing administrative scheme, district courts consider a variety of factors, including:

> the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed; (2) whether payments are triggered

> by a single, unique event in the course of business or on a recuring basis; (3) whether the employer must make a one-time, lump-sum payment or continuous, periodic payments; and (4) whether the employer undertook any long-term obligations with respect to payments.

*Id.* (quoting *Mullaly v. Ins. Servs. Off., Inc.*, 395 F. Supp. 2d 290, 295 (M.D.N.C. 2005) (collecting cases)). Here, the STD plan requires (1) a case-by-case analysis of eligibility and the administrator retains the discretion to grant or deny benefits; (2) payments are triggered on a recurring basis (when considering that employees may apply for STD benefits at various times throughout their employment); (3) payments are continuous and periodic for the eligible term of disability; and (4) the administrator is required to periodically reevaluate each employee's ongoing eligibility for benefits, and must also handle appeals to unfavorable determinations of eligibility after payments end. Thus, the STD plan, as reflected by the Wrap Plan documents, is clearly a "plan" for purposes of ERISA.

The Court also agrees with Defendants' arguments that the plan was "established or maintained" to provide "benefits to its participants or their beneficiaries." 29 U.S.C. § 1002(1). As Defendants note, an ERISA plan "is established if, from the surrounding circumstances, a reasonable person could ascertain the intended benefits, class of beneficiaries, source of financing, and the procedures for receiving benefits." Doc. No. 20 at 10 (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982)). The STD plan has clearly defined benefits and limits, a stated eligible group of employees, along with the specific criteria for use of the program. Thus, there is little doubt that a plan was "established" and "maintained" as contemplated in ERISA.

However, even where an established or maintained plan exists, the Department of Labor ("DOL") has carved out an exception for "welfare benefit plans" whereby "payroll practices" are excluded. *See* 29 C.F.R. § 2510.3-1(b). The DOL has defined payroll practices to include, among other things, programs involving "payment of an employee's normal compensation, out of the

7

employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties or is otherwise absent for medical reasons." § 2510.3-1(b)(2).

Since *Morash* was decided in 1989, "this regulation has been consistently upheld in the courts." *Nardello v. Boehringer Ingelheim USA Corp.*, No. CV JKB-15-3792, 2016 WL 5940844, at *2 (D. Md. Oct. 13, 2016) (citing *Stern v. Int'l Bus. Machines Corp.*, 326 F.3d 1367, 1372 (11th Cir. 2003)). In *Nardello,* the Court determined that a STD plan met the criteria for the payroll practice exemption because the plan was a "substitute for the covered employee's wages and [is] paid from [the employer's] general assets," and noted that even though the benefit becomes available "in the event of a contingency that is outside of the employee's control," the benefits in the plan do not "accumulate over time" and thus do not "give rise to the same concern that motivated ERISA's passage." 2016 WL 5940844, at *3. *See also Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 479 (6th Cir. 2007) (finding that "normal compensation paid to an employee as a result of a disability and from the employer's general assets does not constitute an employee welfare benefit plan, but instead is considered a payroll practice" not subject to ERISA).

Defendants suggest that because the plan provides "short term disability income" to "replace a portion of [a claimant's] income" and is calculated based on a percentage of an employee's weekly earnings (but does not include certain commissions, overtime pay, etc., as part of weekly earnings calculations), that the money provided is not normal compensation.[4] Doc. Nos. 19 at 10, 20 at 12-13. However, the issue underlying the DOL's payroll practices exemption is "whether an employer is substituting normal modes of compensation with disability benefits, for

---

[4] The actual payment amount provided is also subject to any applicable offsets and deductions as a result of other payments, such as worker's compensation. *See* Doc. No. 19-1 at 10.

8

Case 5:24-cv-00141-KDB-DCK    Document 37    Filed 03/27/25    Page 8 of 16

example, while an employee is temporarily disabled." *Davis v. Old Dominion Tobacco Co. Inc.*, 688 F. Supp. 2d 466, 471-72 (E.D. Va. 2010). "The [payroll] exemption is designed to exclude from ERISA coverage the disbursement of funds that are analogous to ordinary wages, paid while the employee is unable, but likely to return, to work, as opposed to those disbursements which are analogous to retirement income." *Id. See also Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (noting that "[s]ince 1979, the Department of Labor has penned eleven opinion letters defining 'normal compensation' to include payments of less than full salary" and finding that a disability plan providing 60% of an employee's salary fell within the scope of the payroll exemption to ERISA); *Diederichs v. FCA US LLC*, No. 23-CV-11287, 2024 WL 5168087, at *2–3 (E.D. Mich. Dec. 19, 2024) (determining that a short-term disability plan which paid 100% of an employee's pay for the first 39 weeks, then 70% for the next 13 weeks was a payroll practice exempt from ERISA because it was paid from the company's general assets and was "tied to the employee's salary and end[s] with the employee's termination.").

Based on this authority, the Court readily concludes that Plaintiff's STD payments were a temporary substitute for his normal compensation as an active employee, even where, as is the case here, the payment was only a percentage of the employee's weekly earnings.[5] KDP attempts to misdirect the Court when it states that the STD plan is paid from a dedicated account, separate from its general assets. While technically true, the account is funded, at least in part, from KPD's general assets and there is no dispute that the STD plan is 100% funded from KDP's general assets. *See* Doc. Nos. 1-2 at 4, 5, 22; 19-1 at 3; 24 at 6-8. Also, the regulation contemplates how the plan

---

[5] The plan provides for either 80% or 100% of weekly earnings for the first eight weeks, followed by 66.7% of weekly earnings for the remaining eighteen weeks with no maximum benefit per week. Doc. Nos. 20 at 4, 1-2 at 6.

9

itself is funded, not whether the benefits are paid from an account that is kept separate from a company's general assets.

In further arguing against the STD plan falling into the payroll exemption, Defendants suggest that because use of the STD plan is contingent upon the plan remaining in effect, which is beyond an employee's control, the plan must therefore *not* be a payroll practice. In support, KDP offers *Sullivan v. Cuna Mut. Ins. Soc.*, 683 F. Supp. 2d 918 (W.D. Wis. 2010), *aff'd sub nom. Sullivan v. CUNA Mut. Ins. Soc'y*, 649 F.3d 553 (7th Cir. 2011). However, in *Sullivan*, the Court found that the sick leave plan in question was subject to ERISA where upon retirement, certain employees, who were not eligible for a sick leave payout, had their leave converted into an account that paid their health insurance premiums, and noted that the employer retained the right to cancel the plan, as they later ended up doing. 683 F. Supp. 2d at 933-34. Thus, not only are the claims in *Sullivan* very different from the claims here but perhaps more importantly, KDP's argument would lead to absurd results if applied broadly. Many benefits offered by an employer may be cancelled at the employer's discretion. That discretion alone does not transform an ERISA-exempt plan into one subject to ERISA. For example, the ability to cancel a bonus plan that would otherwise fit within the DOL's bonus exemption from ERISA would not suddenly convert it into an ERISA plan. Similarly, KDP's discretion to cancel the STD plan—a plan that fits squarely into the DOL's payroll exemption from ERISA—does not morph it into an ERISA plan.

Defendants also argue that the STD plan is but one component in the larger Wrap Plan (which it treats as an ERISA plan) which is comprised of many different benefits, and that the STD plan should be analyzed in that context. However, each component of the Wrap Plan is elected separately by employees and at varying times throughout employment. Thus, the Court considers the STD plan—the only plan at issue here—separately and independently from the Wrap Plan.

10

Importantly, analyzing the plan as suggested by Defendants could quickly become a recipe for avoidance; employers could easily attribute a plan to ERISA (or circumvent it entirely) simply by creating an "umbrella" program, such as the Wrap Plan, and listing desired plans under it. More importantly, it would allow employers to undermine Congress' intent as to ERISA, which is to "ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).

Finally, Defendants urge the Court to consider that it treats the plan as an ERISA plan, including in both the plan documents and in its annual reporting. Doc. No. 19-1 at 15-16. However, neither an employer's "belief" that a plan is covered by ERISA, *see Bowser v. Gabrys*, 746 F. Supp. 3d 256, n.4 (W.D.N.C. 2024) (quoting *Mazer v. Safeway, Inc.*, 398 F. Supp. 2d 412 (D. Md. 2005)), nor "labeling by a plan sponsor or administrator is [] determinative on whether a plan is governed by ERISA." *Diederichs,* 2024 WL 5168087, at *2 (quoting *Langley,* 502 F.3d at 481).[6] Thus, this argument is irrelevant to the Court's inquiry, and the Court finds that the STD plan is a payroll practice exempt from ERISA.

B. <u>The UDTPA Claim as against Unum</u>

The Court next turns to Plaintiff's assertion that Unum violated the North Carolina Unfair and Deceptive Trade Practices Act under N.C. Gen. Stat. § 75-1.1 *et seq.* To establish a claim under the statute, Plaintiff must allege that the Defendant (1) committed an unfair or deceptive act or practice, that (2) was in or affecting commerce, which (3) proximately caused Plaintiff's injury.

A trade practice is unfair "when it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and deceptive "if it

---

[6] This is in concurrence with our sister circuits, including the First, Sixth, and Eleventh Circuits. *See McMahon v. Digital Equip. Corp.*, 162 F.3d 28, 38 (1st Cir. 1998); *Langley,* 502 F.3d at 481; *Stern*, 326 F.3d at 1374.

11

has the capacity or tendency to deceive...." *S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese*, 284 F.3d 518, 535 (4th Cir. 2002) (quoting *Marshall v. Miller*, 302 N.C. 539, 548 (1981)). And while there is "no doubt that the North Carolina courts have construed the U[D]TPA liberally, there are some limits on its application." *Id.* (quoting *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond,* 80 F.3d 895, 903 (4th Cir.1996)). For example, "only practices that involve [s]ome type of egregious or aggravating circumstances are sufficient to violate the U[D]TPA." *Id.* (quoting *Dalton v. Camp,* 353 N.C. 647, 548 S.E.2d 704, 711 (2001)) (internal quotations omitted).

Plaintiff alleges that Unum's "egregious" behavior stems from how it processed claims, including that Unum reviewed claims with the intent to deny benefits; consulted with medical personnel who would support Unum's preferred outcome, discounted Plaintiff's treating physicians; did not have "reasonable standards" for claim investigation, refused to pay claims without a reasonable investigation, and acted in bad faith as related to claim settlements. Doc. No. 1-6 at 14-15. In support of his conclusions, Plaintiff states that the opinions of his physicians were ignored in favor of those who had never treated him and his claim for STD benefits summarily denied. *Id.* at 15. He also states that "upon information and belief" Unum has a "general business practice of basing claims decisions on its own . . . medical doctors" and has "committed further unfair and deceptive practices that will be discovered during litigation." *Id.*

When Plaintiff first became disabled, he applied for STD benefits, which Unum approved. *Id.* at ¶ 19. After sixteen weeks of STD benefits, Plaintiff's claim was reevaluated and denied. *See id.* at ¶¶ 19-20. In its denial letter, Unum stated that it relied on the information from his medical providers, including his neurosurgeon, who had discharged him from care post-spinal surgery and cleared him to work, while acknowledging that Plaintiff still experienced chronic pain. Doc. No. 19-6 at 3. Plaintiff appealed the decision and took approximately eight months to provide medical

12

records to Unum. *Id.* at 5. Unum advised Plaintiff that the appeal review conducted was independent from previous decisions and included a vocational rehabilitation consultant along with a clinical consultant and physician, both of whom were board certified in family medicine. *Id.* at 5-6. The review also included consideration of Plaintiff's medical providers and their notes, spanning from approximately July 2022 to June 2023. *Id.* On December 20, 2023, Unum provided Plaintiff with a copy of the information it considered, and as part of the appeals process, gave Plaintiff the opportunity to review and respond. *Id.* at 8. Ultimately, Unum denied the appeal on February 1, 2024, and provided an eleven-page letter that described its lengthy medical record review and rationale for the denial. *See* Doc No. 19-8.

In support of his UDTPA claim, Plaintiff largely makes conclusory allegations using UDTPA "buzz words" as evidence of a violation.[7] Moreover, the only facts alleged by Plaintiff (that his medical team was ignored in favor of consultants who were hired to deny his and other claims) are contradicted by his own admission to being approved for STD benefits for over sixteen weeks. Doc. No. 1-6 at ¶ 19. Further, it was only after Unum received updated information from Plaintiff's own medical providers that any payments were denied. *See* Doc. Nos. 1-6 at ¶¶ 16-19, 19-6. The denial letters show that Unum carefully considered the entire medical record before determining that Plaintiff was not disabled, and that Plaintiff, not Unum, delayed the appeals process by seeking multiple extensions of time to provide medical records. This is not the type of egregious behavior that the UDTPA statute was intended to protect against. Therefore, Plaintiff

---

[7] Plaintiff uses phrases such as "discounting … claimant's … treating physicians without a reasonable basis," "conducting review … calculated to … deny benefits," "failing to adopt reasonable standards for [] prompt investigation of claims," "has a practice of basing claims decisions on its own … doctors," and "refusing to pay claims" as evidence of egregious behavior. From this, Plaintiff concludes that "Unum committed [] unfair and/or deceptive practices." Doc. No. 1-6 at 14-15.

13

has not plausibly alleged any UDTPA violations and the Court will dismiss this claim. To the extent that there is an implied breach of contract claim against Unum connected to the UDTPA claim, Plaintiff did not plausibly allege it in his Complaint, so it will also be dismissed.

C. *Jurisdiction over the State Law Claims*

Finally, the Court will consider whether it has subject matter jurisdiction over the remaining state law claims.[8] Subject matter jurisdiction "can be raised by a party, or by the court *sua sponte,* at any time prior to final judgment." *In re Kirkland*, 600 F.3d 310, 314–15 (4th Cir. 2010) (quoting *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006)).

The two primary sources of subject matter jurisdiction in federal courts are diversity jurisdiction and federal question jurisdiction. Diversity jurisdiction generally permits individuals to bring claims in federal court where the claim exceeds $75,000 and the parties are citizens of different states. *See* 28 U.S.C. § 1332. Federal question jurisdiction permits an individual, regardless of the value of the claim, to bring a claim in federal court if it arises under federal law, including the U.S. Constitution. *See* 28 U.S.C. § 1331. Federal question jurisdiction requires that "the federal question appears on the face of a well-pleaded complaint." *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 258 (1992). When a complaint asserts a federal question and raises state law claims, the Court may exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3). However, a court may decline to exercise supplemental jurisdiction when the court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Courts typically have "wide latitude in determining whether or not to retain jurisdiction over state claims

---

[8] The case was removed to this Court under both federal question and diversity jurisdiction. The Motion to Remand was denied largely due to the question of whether the STD plan was subject to ERISA (it is not) and because the UDTPA claim allowed for treble damages, thus pushing the amount in controversy above $75,000, the minimum threshold for diversity jurisdiction.

14

when all federal claims have been extinguished," and consider factors including "convenience and fairness to the parties, the existing of underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (citations omitted). After weighing those factors, the Court concludes that it will decline to exercise supplemental jurisdiction over the state law claims in the absence of a viable federal question.

The only possible remaining basis for jurisdiction is diversity. Given that the UDTPA claim, which carries treble damages if proven, will be dismissed, there are only two state law claims, both involving the same ten weeks of STD pay, for which Plaintiff seeks at least $25,000 but less than $75,000. Doc. No. 1-6 at ¶¶ 33, 40. As such, while the parties are diverse, the amount in controversy is now less than the $75,000 threshold and the Court lacks diversity jurisdiction over the remaining state law claims. Thus, the Court will deny Defendants' Motions to Dismiss as to the breach of contract and North Carolina wage violation claims without expressing any opinions as to the merits of those claims and will remand the claims to the North Carolina Superior Court for Lincoln County.

In conclusion, the Court finds that the STD plan is not an ERISA plan and will deny Defendants' Motions to Strike Plaintiff's Jury Demand. It will grant Defendant Unum's Motion to Dismiss as to the UDTPA claim. It will also adopt the M&R to the extent that it recommends denying Defendants' Motions to Dismiss as related to the breach of contract and North Carolina wage violations as against KDP and granting Defendant Unum's Motion to Dismiss as to any implied breach of contract claim.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. The M&R (Doc. No. 33) is **ADOPTED** in part and **DENIED** in part, as set forth above;

2. Defendant Unum's Motion to Dismiss as to the UDTPA claim and any implied breach of contract claims (Doc. No. 18) is **GRANTED**;

3. Defendant Unum's Motion to Strike Jury Demand (Doc. No. 18) is **DENIED**;

4. Defendant KDP's Motions to Dismiss and to Strike Jury Demand (Doc. No. 19) are **DENIED**;

5. The case is **REMANDED** to the North Carolina Superior Court for Lincoln County for further proceedings; and

6. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: March 27, 2025

*[Signature]*

Kenneth D. Bell
United States District Judge